I have you down for eight minutes rebuttal. Is that correct? That is correct. Twelve and eight. Okay, thank you. Yes, Your Honor, that's correct. Thank you. You may begin. Your Honor, the appellants are here asking this court to reverse and remand this case back to the district court based on the errors that occurred relating to the orders issued by the court, the orders granting summary judgment, and the orders denying a new trial. Your Honor, this case involves an individual who was suffering from mental distress. He had a psychotic break and his parents called, well his father called the police along with his father's girlfriend as a result of that. They never saw him act in this manner before and it really was concerning to them, so they called the police to help, called 911. With that, the officer that arrived on the scene was one of the defendants here, which is Defendant Bennett, and Officer Bennett arrived and once he arrived, he learned that there was a mental concern that the parents had. And that goes to part of the error that the court, the district court, causes decision to be erroneous and that goes to the summary judgment. The district court admitted that it did not review a critical part of the video that was available to it at summary judgment and that video is a video of the plaintiff here, Eddie Wilson, which is a female, his mother, begging for help for her son. Isn't the first issue on the summary judgment whether, you just mentioned the defendant Bennett, with regard to the false arrest claim, was there probable cause for a false arrest at the time? So tell us about where the error is on the summary judgment in that regard. Related to Officer Bennett, the false arrest with him as a particular individual comes from the fact that he was made aware that this individual, my client, had a disability and he disregarded it. I mean, he was deliberately indifferent to the cries and the knowledge that was put forth to him about the mental illness. And as far as the false arrest is concerned, on the scene, when he was made aware of that, that also made him aware that Chester Jackson did not and could not form the requisite cobalt mental state to have committed a crime. And then we go back and we look and we see that, according to the recommendation, that he was arrested for public intoxication. And we come to find out that that was just erroneous. But the R&R, the recommendation, actually tries to conjure up an intoxication by saying that he had THC in his system. Well, we all know that THC can last in a person's system for weeks, although the intoxication has left. And there was nothing that Bennett had presented to the court to say that there was anything other than that, these subsequent reports. He didn't say that he smelled any type of substance on him, any alcohol. All he said was simply that he was hypothermic, he felt cold, and that he was responding too slow. These are things that can also demonstrate that he was in medical distress. And for him to just disregard the fact that there was no medical distress, even though he's learned from the family that other things, he actually acts concerned at one point, if you're able to watch the video, and I encourage the court to watch the video, he actually was concerned and listened to the mother at one point, but then he decided he was going to disregard all that and arrest him instead. Now, I would... In the officer's purview to disregard what someone, even a relative at a scene tells the officer, is that in and of itself improper? I think it is, but even if it... They summon the officers to the scene. Right. So their officers are responding to a complaint made, in this case, by the parents. Yes, to investigate. And that's a part of the investigation, I think, is to take in all the information that you can. And in this case, he made his own investigation to get to what he wanted to conclude, which is that Chester Jackson was on PCP. And in fact, you can hear him on the radio saying, I got one, he's on PCP, and then there's this welcoming committee for him. And then we see also in the video that Chester Jackson was compliant at all times. He was never... There's all these allegations that he was violent and just out of control and all these things, but not one time has this been caught on video. There's not a single video out of all the videos that are presented that shows that Chester Jackson was violent to anyone. There's all these subsequent reports. And mind you, at the time that these reports were collected... But he's summoned because Chester Jackson attacked his father. Isn't that correct? Isn't that the purpose of the call, how the case started? That's the allegation, that he attacked his father, but his father is on the scene and made it clear. That is my son. And he has never acted this way before. I'm his father. When he said, did he attack you? He said, I'm his father. His father was equally concerned about his mental state because he had never seen him in this way. So, yes, he... But his father was never in fear and never concerned of being hurt or injured by his namesake. With regard to the summary judgment, which also included the ADA and rehabilitation claim, are you saying that the officers should not have arrested Chester Jackson at all once they arrived at the scene and asked questions and investigated, that they should not have taken further action at that point? I don't... To be honest with you, I don't believe that taking him into custody was necessarily erroneous. I think what happened to him after, with not having evaluations and so forth, that's where the biggest issue comes from, the prosecution. You see, as he was... They tried to magistrate him three different times. One magistrate was so upset with him, they said that he wished he had a rope for him. He was actually... There was actually a judicial finding against him for that comment that he made, that he wished he had a rope for him acting that way. And so these are things that... In taking him into custody, if he was taking him into custody to get him mental health help, just taking him into custody, detaining him, that's different than an arrest and charging him with a crime. So I'm not necessarily arguing the detainment. I'm arguing the charging of the crime as far as the false arrest is concerned. And as it relates to the actual trial itself, I know I don't have much time left here, but as the trial itself, there were a lot of things that trickled down from that incident because he did not get the adequate care that he needed, and there was no training from the city of Caldwell, their officers, on how to handle with somebody that is dealing with a disability as it relates to a mental disability. And I say that to say there's argument here that I should have been able to... And I was a trial attorney. I should have been able to get discovery as it relates to Caldwell before they came and summary judgment was filed against them. But the discovery that I was able to gather, I was able to show that there was a failure to train based on their own evidence. They put forth a policy in the exhibit, and that policy stated that they have to report, well, supervisors have to report use of force. There is no policy that says that officers have to report use of force. And you can look through that policy that is presented, and you won't see that there is a policy for officers to report. It only skips that. And, in fact, in Baucom's deposition, he actually indicated that they have one policy in the office and they pass it around, and that is the training they get on these issues. But there is no training in that policy whatsoever as it relates to the American with Disabilities Act, and I believe that that is the reason why he was clueless on what to do in this situation. And as far as the evidence at trial, I believe that, you know, the court, there was a lot of errors in the court as it relates to what happened. As far as the evidence that should have been allowed in the trial and in the closing arguments, there's so much I don't feel like I can get it all in these last two minutes. But I would like the court to review the fact that the Fifth Circuit is quite clear when it comes to the Golden Rule and how it's violated. And if you read the transcript, you can see clearly that there was no violation. In fact, in the motion for new trial, the district court pretty much acknowledged that that is the rule, that it does not apply to liability, it only applies to damages. And you can see in the transcript that damages had not been even discussed at that point and that they alleged that there was a violation of the Golden Rule, which I reject wholeheartedly anyway. But despite that, even if there was a violation, I mean, even if there was a mentioning of the Golden Rule, put yourself in the other person's position, I don't believe that you'll find that it was related to damages. And so I believe, and as a result, the jury was admonished to disregard everything that was said during closing. And I know and I believe wholeheartedly that that did prejudice the appellants in the jury verdict. Was the instruction to disregard everything said during closing argument or just to strike the Golden Rule reference? I don't think it was qualified, but I believe that it was meant for just the Golden Rule, which was not, it wasn't lined out for the jury in that manner. And you had argument after that admonition? In other words, did your argument continue? My argument did continue the best possible in the frustration and so forth. But also, if I can address Burleson County, there was a, there's a failure to train as far as the, there's a condition of confinement claim. Chester Jackson was left with shackles and handcuffed in a cell when, again, there is no indication of violence. If you look throughout the record, you won't see that he was violent or any even allegation of him being violent within that jail to support the fact that he needed to be restrained after he was tossed in the cell by Robert Bauckham. And as it relates to Robert Bauckham, the use of force, I think the case law is abundantly clear that when there's no need for the use of force, it has to be weighed for the use of force that was, that was given to the, to the individual. And here, Chester Jackson did nothing more than to, to complain. Okay, counsel. Thank you. You've saved time for rebuttal. Thank you. We'll hear from Mr. Barron now. May it please the Court. Good morning, Justice Dennis, Judge Englehart and Judge Oldham. My name is Stephen Barron and I represent Robert Riley Bauckham in this case. And at bottom, Robert Riley Bauckham went to trial on an excessive force case sounding under the 14th Amendment because Chester Jackson, Jr. was a pretrial detainee at this point. And the jury unanimously found that he didn't use excessive force against Chester Jackson. This incident was caught on video. The jury had an opportunity to review it. In closing argument, counsel slowed the video down and allowed the jury to view what might be considered an unclear video. And they, sitting as the fact finder, made a determination that Robert Riley Bauckham didn't intend to use force against Chester Jackson, Jr. because he was surprised by emotion that is hard to see on the video but arguably can be deduced by a fact finder based on the lack of space in between Chester Jackson, Jr.'s hands and my client's groin area. And my client testified when he was directed by trial counsel that this was a surprise to me and I unintentionally dropped him. And so it's not so much that there can be no use of force when someone is not resisting arrest or something like that. This wasn't a use of force at all because it was unintentional. And Judge Pittman correctly instructed the jury on that regard. He said that, you know, plaintiffs must prove by preponderance of the evidence that Bauckham purposefully or knowingly used objectively unreasonable force against Jackson. And so with Bauckham testifying that I never intended to use force, well, under this Court's precedent in Scott and Jones, an officer's testimony can support a verdict in a case just like this where there's an unclear video and plaintiffs can disagree with the result that that jury might reach, but that doesn't necessarily mean that there is an absence of evidence to support this jury's verdict, which is what this Court reviews this jury verdict under. And I'd like to spend the next portions of my argument discussing something that I believe appellants raised for the first time in their reply brief, and that is this idea that the district court erred when he refused to admit the Nolo contendere plea into evidence as an admission or as a judicial admission. It's not particularly clear from appellant's reply. And she cites this case. It's a case from a magistrate from about 2006, I believe, Maybury v. Hamblin. And essentially what this case was about is it doesn't really stand for the proposition that appellants cited it for. What this case is about is a magistrate judge was doing a HECT analysis to determine if this plaintiff in a 1983 case was precluded from bringing their claim, their excessive force claim or their wrongful arrest claim, as a plaintiff because the Nolo contendere plea that they pled to was not admissible under Federal Rule of Evidence 410. And what the magistrate judge found persuasive was the Sixth Circuit's interpretation of this issue in a case called Walker v. Schaeffer. And that court there said, look, the purpose of Rule 410 is that Rule 410 was intended to protect a criminal defendant's use of the Nolo contendere plea to later disfend himself from future liability. And that's exactly what happened with Robert Riley Balcom here. He was being investigated by a Texas ranger for official oppression. It was actually a much higher investigation at that point for a more serious offense. And the prosecution allowed him to plea Nolo contendere to a Class A misdemeanor of official oppression, and that was the end of it. He gave up his license and served no jail time. And so this Mayberry case that counsel wishes to cite for the purposes of saying that the district judge erred when he refused to follow the statute, follow Rule 410, the statute, to admit this Nolo contendere plea is just simply not apropos in this case. And now, so I'll go back to the Golden Rule now because I think counsel mentioned that. And, Justice Judge Engelhardt, to your question, the judge only admonished appellant's counsel on that particular issue. And you'll find this on the record in appeal on pages 2763 and 2764. And the court merely said, ladies and gentlemen of the jury, counsel's making an improper argument right now. You're not supposed to put yourself in the shoes of Chester Jackson, Jr. And that's exactly what the Golden Rule is. And appellant claims that the district court admitted that it made a mistake. The district court, in its order denying their motion for a new trial, never admitted such a thing. Instead, what the district court said is, it's true that under this court's precedent in a case called Burrage, that if your arguments that essentially say you need to put yourself in the shoes of the plaintiff or the defendant or whoever in this matter, goes to the issue of ultimate liability. And I think the Burrage case was like, imagine yourself behind the wheel of this car and something swerves in front of you. Imagine, what would you do? Would you swerve? Would you brake? And that was to the question of negligence as to how they operated this car. Here, the district court, in its order denying the motion for a new trial, was not buying appellant's argument that her argument to, aren't you glad that your family and that your friends and your sister weren't Chester Jackson, Jr. on that day, has absolutely nothing to do with liability and is absolutely a violation of the Golden Rule. Because what the Golden Rule is meant to do is it's supposed to prevent mostly plaintiff's attorneys from inflaming the jury's passion due to an alleged bad act and therefore give a larger damages award. That's what the Golden Rule is meant to prevent. And I really do commend the district judge's motion or order denying the motion for a new trial to this court because he lays it out perfectly. Her arguments presupposed liability and therefore this absolutely was a Golden Rule violation and therefore he absolutely was appropriate to solve the suit by giving this instruction. I'm going to go on to the time restraints now. I know that appellant's counsel didn't talk about these time restraints in her opening argument to this court, but I'd like to touch on them briefly because I have some extra time. And this court's holding in Davis v. Allstate is just right down the middle for this issue. The record is replete. Judge Pittman did an excellent job during the trial of making a pretty comprehensive record of the technical audiovisual issues that plaintiff's counsel was having in trying to play, for example, the incident video that captured the incident that appellants allege was excessive force and the jury found unanimously was not. And what it is is the court has discretion to manage its docket so long as it is managing it reasonably. And in the day's decision, the district judge pre-warned that you were going to have this amount of time to present your case and here the district judge at the pre-trial hearing warned us that we were going to have five hours to present our case because there weren't that many witnesses that were going to be admitted at this trial. And so with very few witnesses, we got five hours. The defense put on its case within five hours. And when appellants' counsel made their oral argument or oral motion, rather, to ask the judge for more time, I think that I would commend this court to the judge's record at that stage where the judge sort of comprehensively laid out the self-admitted stalling tactics that appellants' counsel was using in order to mask the technical difficulties that they were having. So to the extent that this court is in any way troubled by appellants being cut off because they were going over their time, I would commend that section of the record on appeal to this court. And then finally, I'd like to close off by just saying I think there are real preservation issues in this case. As I cite at the outset of Balcombe's brief, this court simply doesn't directly review verdicts. It directly reviews new trial motions. That's the Coughlin case. And so here, where you've got a motion for new trial that, when it attacks the verdict, doesn't really engage with the evidence, doesn't cite to the record, it merely sort of, and I think Judge Pittman wrote this in his order denying the motion for new trial, said, you cited to me some generic standards about excessive force, and then you didn't do anything else. And so on this record, without anything more, I'm not going to sit as the seventh juror, I think he'd be in this case, and overrule this verdict. And when it comes to not admitting the Texas Ranger report and also when it comes to not admitting the Nolo plea, the motion for new trial, it was a header with no text underneath it. And so Judge Pittman looks at this header and says, I don't even know what I have to rule on here, but I guess if I do have to make a ruling, it's not error, and based on the arguments that you've made to me, it doesn't entitle you to a new trial. And I think this court would be, if it would like to, I think this court would be well served if it took a careful look at the preservation issues in this case, and really if it wanted to dismiss it in toto on those grounds, I think it would be appropriate to do so. And I will give you back five seconds. Thank you, Counsel. We'll hear from Ms. Salinas. Thank you. I represent Burleson County and Deputy Bennett in this case. My name is Joanna Salinas, and I'm here asking for the court to uphold summary judgment that was granted on all grounds for these defendants. The first issue I want to talk about is probable cause and the false arrest claim, because it does sort of tie in to the other claims that are being made. Fundamentally, the 911 call that brought Deputy Bennett out to the scene almost does everything for defendants. The phone call wasn't just, hey, we've got an incident here, come out here. It is two frantic phone calls by Chester Jackson's stepmother indicating that someone is being assaulted, that the door has been kicked in, that she is worried someone is going to be killed. The allegations made in that are very particular and are talking about specific incidents. He has struck my husband twice in the face. It is not a generic phone call. It is a very specific one. It also includes the statement, his girlfriend says she gave him marijuana, but I think it's more than that. It indicates in another place he's on drugs. And so that's the scene that Deputy Bennett finds himself in when he arrives. At that time, the family does mention that he has some mental health problems, and Deputy Bennett, to his credit, does talk to Mr. Jackson and to the mother saying, look, if he'll just go with you and you can get him a bed at a hospital, that's fine. But Burleson County and our sheriff's office cannot just transport people. The statement made by counsel here today was almost astounding to me, that she did not find it necessarily erroneous that we took him into custody. We don't have them in between state. If we have taken him into custody, we need probable cause. We can't just take people places. And so to me, that is basically a concession that we had probable cause, which means Deputy Bennett shouldn't be here, because all Deputy Bennett did was arrest him and bring him to the sheriff's office. He was placed into a cell where they tried to magistrate him. So this is Friday night. They tried to magistrate him on Saturday, but he is nonresponsive. Saturday night, he destroys a jail cell, has to be transferred, and one of the allegations in this case is that he was shackled for that transfer. And he was, because he had just destroyed a jail cell and was being transferred. When they tried to take the shackles off him, he was fighting them, and that is in the record, the jail record showing the efforts made to try to get those restraints loosened is in the record. It shows that we then kept him on a 15-minute check and that we made three attempts to loosen the restraints, and on the middle attempt is when he bit one of the jailers during that attempt. And all of that is in the summary judgment record. And by 6 a.m., he had calmed down enough that they were able to get him less restraint. By later that morning, MHMR was able to come out and meet with him, come up with their own analysis, which included her analysis that it did appear that he had suffered from some sort of drug-induced psychosis, consistent with what Bennett's observations were when he was out there at the scene. So at Friday night, he is arrested. By Sunday morning, he is being seen by MHMR. And on their finding a bed for him in Austin, by that afternoon, he's being transferred to a facility. There is no violation of his rights to not be arrested, and there's no violation of the ADA when you arrest someone for something you have probable cause for. There's certainly no evidence that he was denied any significant medical needs. There's just no summary judgment evidence offered by an appellant that says, here's what Burleson County should have seen, here's how they knew that he had a serious medical need, and here's how they were deliberately indifferent to that need. The only allegation is the family members at the scene indicated that he has a mental health problem. That's all that they were told. That does not create a serious medical need, does not raise evidence of any kind of deliberate indifference. There's also no indication of any issue of conditions of confinement. It's not clear if the allegation is tied just to arresting him, or if the allegation is tied only to having constrained him during transfer. But in neither case do we have any evidence that is offered. I think the biggest issue, and you can see it in Magistrate Lane's report and recommendation, is that the response to summary judgment is challenging to understand. It has a number of typos, it has a number of references to things that don't exist, it has a number of references but they have blanks at them when you're supposed to figure out where to find them. The issue in this case is that counsel failed to produce a record on which the court could find that there was a genuine fact issue. And that's why the report and recommendation was upheld by the trial court. The claim that because the district judge during trial mentioned that he needed to see the video does not create a fact issue. The court needed to have one established. And that statement doesn't mean that the summary judgment was improperly granted. As a result, we're asking this court to uphold summary judgment for both of these defendants. And if the court doesn't have any questions, I'll give my time back. Thank you, counsel. Mr. Vianna? May it please the court, I'm Ray Vianna. I'm here for the city of Caldwell. I have a very short period of time so I'm going to address only a few of the points that I have. This is a case where the city is brought along because one of its employees was involved in this jail incident. However, from the very get-go, the city filed motions to dismiss. And each time until the very end, the court reviewed them. In one case, granted it, but without prejudice allowed a third repleting. And in that particular case, the case was dismissed with prejudice. That ruling has not been appealed from. That is an independent ground for affirmance and nothing else needs to be considered from that point. But we have a one-paragraph argument in appellant's brief that pertains to the city. It only raises a procedural point. I heard comments about evidence of policies and not having policies and that sort of thing. There is no point of error concerning the summary judgment, which was the other ruling that Judge Pittman granted for the city. Both motion to dismiss and motion for summary judgment. But there's been no appeal from the summary judgment. Only an appeal from the trial judge's refusal after the discovery period had already passed for nearly two months to reopen discovery and allow 90 days more of discovery on no specific topic, just a fishing expedition to see if evidence could be found to oppose the city's motion for summary judgment. So the dispositive rulings for the city have not been appealed. We have filed a motion for sanctions here because here the city is being dragged along where there is no argument that's been addressed to the motion to dismiss and that the arguments concerning the city on the extension of time have not even been adequately briefed. We're here. My time is up. Thank you. All right. Thank you. All right. Ms. Lewis, you have eight minutes of rebuttal time. Your Honors, as it relates to Baucom and the use of force that he denied, we actually, in trial, provided the case that allowed for the judicial admission of a conviction. In this case, as opposing side indicated, he actually pled guilty to official oppression. Those facts that he pled guilty to in the official oppression relate to the excessive force, to the pushing of Chester Jackson. He should have been stopped from alleging anything different than that. And for him to go to the criminal court and plead guilty to those actions, he never said, I was making separation. He never said, oh, it was, you know, I'm not guilty because of these other reasons. He, after preparing for the civil trial, indicated now, all of a sudden, that he did, in fact, push him, but for separation purposes. All the other times leading up to that, Chester Jackson fell, and so on and so forth. And I'm just going to skip on as far as the, I want to correct what I stated earlier. If I misspoke, I don't know if I did, about the trial court admitting that the golden rule in his order had not been violated. I will say that he admitted what the requirement is for the golden rule. That's what he admitted. So I just want to make sure, I don't want to make a misrepresentation to the court. He admitted that liability is the only basis for that and tried to show that I was arguing beyond liability. And so as far as the city of Codwell is concerned, I would ask, this appeal is not frivolous. And if we get back to what Rule 56 requires, and that is, if this is a summary judgment that they are asking for, which they did, then we are entitled to notice and we're entitled to an opportunity for discovery and put forth evidence. But again, as I stated, the evidence that- He just indicated, your opponent just indicated that the discovery deadline had already expired. Is that true at the time the court had before it the motion for summary judgment? I believe that is true. If not, it was just expired, but they had just come back into the case. And so if they return to the case after the discovery deadline, that's even more reason that we should have been entitled to discovery at that juncture. Did they move to extend the deadline prior to the filing of the summary judgment motion? I didn't know that they would be filing a motion for summary judgment. They appeared with an answer, and that was their appearance, is the summary judgment. That was the motion that they filed upon coming into the case for the second time. And so I didn't understand. I didn't know that they would be filing a summary judgment. I guess based on the deadline that they had available, they wanted to meet their deadline of filing a dispositive motion, and that's why it was filed. I can't assume for them. But in any event, when it was, I did ask for discovery. I did put in the record, you will find that there were negotiations amongst the attorneys for discovery. We were amicably trying to get discovery done. The Cotwell refused to engage in discovery, you'll find in the record, that they said they would not engage in discovery until there's a ruling. So that was a part of the reason why I wasn't able to get discovery. And the negotiations continued, and we expected them to operate in good faith and allow us to at least respond to the summary judgment fairly. And I want to go to the Burleson County's response here. Now, they said that there was a frantic phone call about Chester Jackson attacking his father. Again, we go back to the, I think I've already addressed the mental state aspect of that. But what I am more, I would like to point out is that the fact that this phone call occurred, that presupposes that Bennett actually heard that phone call. That Bennett actually knew the facts in that phone call when he arrived. All these different allegations, they're not supported by any evidence that Bennett actually knew of this information when he arrived on the scene. He got a phone call. The CAD records will show exactly what he was responding to, and that would be the reason why he appeared. And I haven't found a CAD record that actually puts quotes of individuals' comments in there. Can that be something that could be covered at trial when you have the witnesses on the stand, at least through the discovery process of what he knew and what he didn't know? It could have, yes. But I didn't get, he wasn't in trial. I actually tried to get him. I issued a subpoena, and it was quashed because they were dismissed from the case kind of last minute. We had already put all of our pretrial, and I didn't know that he would not be a part of the trial, so I had to subpoena him, and it was quashed. And as far as the MHMR, MHMR is not medical. They have no ability to provide medical care. They have no ability to diagnose. They have no ability to treat anybody with mental health, and this particular person is a social worker. And the fact that a social worker decided that she believed that he may be on some sort of substance, which we all know is untrue at this point. We know that it's false at this point, is not adequate medical care provided by Burleson County. And Burleson County is required to provide adequate medical care. And in the brief, we actually discussed the fact that he didn't even get an intake medical. You can't, you won't find anything so simple as a vital sign taken from Chester Jackson while he was in jail. And as far as the allegations of there being some evidence of this violence by him, there is nothing in the record that shows that Chester Jackson was violent in any manner in the custody of Burleson County Jail prior to the BOCM taking him and tossing him in that cell. You won't find it. And that is something that has been used throughout to support the fact that he should have remained in these restraints. And again, I don't think that it's strange that there's no video of this alleged violence after the fact. This body cam that was worn by the individual that admitted to striking Chester after BOCM did disappeared. It doesn't work. It was broken. And by Chester, no less. But there is no evidence that, and remind you, none of this, none of this came into evidence. None of this was reported. None of this was documented until he showed up and there was a request from his family to give us answers. And that was nearly a month later. None of this, there was no reporting of any of this before anything. And I will just ask the Court one thing as it relates to the report and recommendation. ROA 1840 through 1849 shows that the difference in the recommendation and the evidence that it put in that was a part of the record, but not in the brief of the appellees at all. They sift through the record to put in favorable facts for the appellees. And I'm not sure if they were able to do that, but in any event, thank you. Thank you, Counsel. Thank you all for the briefing in this case. The Court will consider the matter submitted.